Filed 5/1/14  O'Neil v. Hoss CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| CYNTHIA O'NEIL et al., | C072738 |
| Plaintiffs and Respondents, | (Super. Ct. No. HR56401) |
| v. | |
| DAN HOSS et al., | |
| Defendants and Appellants. | |
| CYNTHIA O'NEIL et al., | C072813 |
| Plaintiffs and Respondents, | (Super. Ct. No. HR56395 ) |
| v. | |
| ANNA HOSS et al., | |
| Defendants and Appellants. | |

1

In consolidated appeals from restraining orders granted against defendants Dan and Anna Hoss, we find substantial evidence and affirm in both cases.

## BACKGROUND

The Hosses, who are embroiled in litigation with neighbors over a road easement (the underlying case), engaged in allegedly harassing conduct on and off the road several times. Three specific dates of alleged misconduct and numerous acts occurring on unspecified dates were described by the evidence, as we shall explain.

*Petitions*

On August 29 and 30, 2012, Cynthia Lou O'Neil, her husband Gregory Kent O'Neil, and their daughter Riley O'Neil, filed civil harassment restraining order petitions against the Hosses, a couple who own property on the same rural road that the O'Neils live on, Nelson Ranch Road. Each petition was supported by the same attached documentary evidence, 10 declarations summarized as follows.

Cynthia O'Neil declared that on July 10, 2011, at about 9 p.m., "I heard what sounded like an ATV[1] going up and down the easement in front of our house. I . . . noticed the Hosses['] UTV driving erratically up and down the easement right in front of our house at a high rate of speed. I witnessed it going right over the culverts into the ditch and was very worried the UTV was going to flip. Then I saw the UTV doing donuts right in front of our house." She then saw the UTV drive on to her property, despite posted "No Trespassing" signs, and it stopped behind the O'Neil's workshop for about 15 minutes, with the lights off. It then drove about 30 feet and stopped in front of their garage, with the lights turned off. When Greg O'Neil called out, "It was Anna [Hoss's] voice that yelled out, 'How did we get here?' With her erratic behavior on the UTV and slurred words I could tell she was intoxicated again." The UTV left "[a]fter

_____

[1] The parties used both "ATV" and "UTV." The vehicle was a two-seater "side-by-side" Utility Terrain Vehicle, rather than an ATV, or one-seater All Terrain Vehicle.

2

sitting in front of our house for about 15 minutes." "I could see that she had turned the lights off again. At that point I saw the Hoss[es'] truck fly up the easement at a very high rate of speed." Her family "felt very scared and threatened during and after this incident." The next day, she saw "UTV tracks all over our property up and down the sides of the easement and in front of our house." Pictures showing damage by the UTV tracks were attached.

Greg O'Neil corroborated his wife, and added that he had "previously seen the Hosses drive around on the UTV with a rifle between them."

Riley O'Neil declared that on the night of February 20, 2012, she was home alone when she saw the Hosses' truck (not their UTV) drive onto the O'Neil property with its light off, and it stayed for 15 minutes, which "terrified me . . . because I knew they had been sitting out in front of my garage for awhile."

Cheryl Garrity declared she lived on Oak Tree Lane, apparently a side road off of Nelson Ranch Road, and on July 31, 2012, saw the Hosses and another man in a UTV in their driveway. Anna Hoss yelled that Oak Tree Lane had been ruined (using an expletive) by their culvert, whereupon Garrity's husband John asked how their "little driveway culvert" had hurt the road. "I could hear foul language continue from Anna. Dan [Hoss] asked if we had dogs. John pointed to the kennel and said, 'Yes, we have two - there is one and the other stays in the house.' Dan said we should shoot them because they bark too much." Several times, Anna accused the Garritys of working with the O'Neils. "It was obvious" that the Hosses were intoxicated.

John Garrity corroborated his wife on these points.

3

Carlin Hagen[2] declared that on the night of July 31, 2012, he saw the Hosses drive by the Hagen house, which is "further back from the road" than those of the O'Neils and Thompsons, and the Hosses stopped in front of the O'Neil home. On prior occasions he saw them "driving slowly back and forth" in front of the Hagen driveway.

Sheri Hagen declared that she had seen the Hosses "driving slowly back and forth" on the easement in front of the Hagen house on several occasions.

Anthony Schumacher "met" the Hosses "coming down Oak Tree Lane" on July 31, 2012, spoke to them, and found them both too drunk to drive.

Edgar Thompson declared his dogs started barking on the night of July 31, 2012, and he saw the Hosses "and a big man who appeared to be a biker . . . parked on our driveway parallel to our front door. All three of them appeared to be very drunk. In the past I have seen them carry a gun while they rode their UTV. I have told them numerous times in the past they were not welcome at any time on our property. I was very uneasy having them parked in our driveway, and because of the current lawsuit and the fact that they were drunk I was concerned that they might use their gun. . . . [A]ll three of them proceeded to turn and stare at me for several minutes." The next day, peace officers took pictures of the scene, "stating that according to the tracks the Hosses had driven right up to the porch."

Connie Thompson declared she had seen the Hosses with a gun in their UTV, and they had "just sat on the easement in front of our home on several occasions."

_____

[2] The instant petitions also sought protection for Carlin and Sheri Hagen and Edgar and Connie Thompson, who own two other servient parcels and are also defendants in the underlying case.

*Opposition*

Anna and Dan Hoss opposed the requests for restraining orders, denying the factual claims and also asserting their actions were not harassment and the petitions were retaliatory, because the Hosses had appealed in the underlying case.

*Hearing Testimony*

At the hearing, the trial court confirmed it had read the declarations we described *ante*.

Cynthia O'Neil testified the Hosses trespassed on the night of July 10, 2011, when she saw their UTV on the O'Neil property, "then they would just floor it and gun it and tear on down the easement. [¶] This continued back and forth doing donuts, spinning out, and then all of a sudden I saw them go up on our property" which "continued for quite awhile." She turned on the garage light hoping they would leave, but instead, "their UTV stops on the other side of my shed, shuts off and turns its lights off." This frightened her, because she had heard they carried a gun on the UTV, and they were very angry people. Her husband eventually called out to ask what they were doing and Anna Hoss was drunk and yelled "how did we get here?" Anna Hoss was usually intoxicated in the evening. Her husband told them to leave, but they stayed for 10 more minutes. Later, she saw the Hosses' truck "fly up our road at about 55 miles an hour up our easement." She thought it must have been Dan Hoss driving. The next day she took pictures showing tracks "on our property off the easement, circles, skid-outs, everything she did for the 45 minutes she was there." Although the Hosses were allowed to use and inspect the easement, they could not reasonably have been doing so on that occasion, at night, "tearing up my driveway." Apart from that incident, although there were threats to sue in court about the easement, neither Anna nor Dan Hoss had threatened to harm her physically.

Riley O'Neil, age 16, testified she was home alone eating dinner at around 7 p.m. on February 20, 2012, when she could see the Hosses' truck come from the area of their property to the O'Neil property, which scared her. She looked out the window "to make sure they left, and they never drove away. [¶] My dogs were barking and I was really scared and their light flipped off because there's no light shining anywhere so I called my parents and told them I was scared and to come home, and I sat there for 20 minutes, and after 20 minutes they left."

Edgar Thompson testified that on the evening of July 31, 2012, Anna and Dan Hoss, and a "pretty rough" looking third person with long hair and a beard "drove up and parked right in front of my front porch." This was 10 feet from his steps. He was afraid to go outside because "[t]hey do carry a gun every now and then," but eventually they left. He had told them before "many times" not to come on to his property. He had seen them with a rifle or shotgun mounted between them in the UTV before. The Hosses were habitual, angry, drunkards, and they behaved that night in a manner suggesting they were again drunk. When they drive by his place they give him "the middle finger." Neither Hoss had physically threatened him, and he used to socialize with them before the underlying case began, which is "how I know when they're in [an] intoxicated state."

Carlin Hagen testified that on July 31, 2012, around 6:30 or 6:45 p.m. (while it was "light enough"), he saw the Hosses in their UTV going onto the O'Neil's property, then stop in front of a wood pile. He had previously seen them carry a rifle or shotgun between them in the UTV, the last time being about a month or two before. He conceded that the wood pile was in an area at issue in the underlying case.

Greg O'Neil testified he had seen the Hosses with a rifle or shotgun in their UTV several times. Before the July 10, 2011, incident, they often drove the UTV "up and down at reckless speeds, [then] slowing down. We're out washing our car, they'll slow down and just stare at us, give us the [evil] eye in a real threatening manner, not being neighborly. Numerous times we've seen them up and down the road going into ditches"

6

at "excessive speeds. When they've been drinking and they're intoxicated, they're flying up and down and they don't just drive on the road, they fly into the ditches, they go into where the culverts are. It's very dangerous." After he spoke with Anna Hoss during the July 10, 2011, incident, he saw "Dan race up the road at 50, 55 miles an hour in his silver truck, flying up there"; although he admitted he did not see Dan Hoss's face on that occasion, but he knew it was Dan Hoss's truck.

The Hosses testified that they lived in Reno and had a part-time residence in Lassen County, where they were on February 20, 2012. If Riley O'Neil saw a truck on the O'Neil that day, it was not theirs. On July 10, 2011, they did not drive back and forth and up and down the road. On July 31, 2012, Dan Hoss *did* go to Ed Thompson's property, to discuss a stove, and Thompson had never told him to stay off the property, only not to talk to him. He did not go to the door, and eventually left. He had owned a rifle, but did not carry it or any gun in the ATV.

*Ruling and Appeal*

The trial court found the O'Neils had shown a sufficient pattern of harassing conduct to warrant restraining orders to protect *them*, but not the Thompsons or Hagens. The details of the restraining orders are not relevant to the claims on appeal. Written restraining orders were filed on October 12, 2012. After the trial court denied their motion to vacate the orders, the Hosses each timely appealed. We granted their motion to consolidate the appeals. The appeals lie. (See *R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 187.)

## DISCUSSION

### I

*Contention and Standard of Review*

The Hosses contend no substantial evidence supports the restraining orders because "there was no clear and convincing evidence of harassment."

This method of framing their argument is somewhat misleading. The trial court was required to make certain findings, described more fully below, by using the clear and convincing evidence standard. But the trial court's application of that heightened standard does not require that we deviate from the ordinary standard of review on appeal. With *any* factual conflict, "On appeal, the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 371, p. 428.) "We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge in all legitimate and reasonable inferences to uphold the finding of the trial court if it is supported by substantial evidence which is reasonable, credible and of solid value." (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762.) Whether the facts "are legally sufficient to constitute civil harassment" presents a question of law. (*R.D. v. P.M., supra,* 202 Cal.App.4th at p. 188.)

And, contrary to the Hosses' argument, because there was no statement of decision, we view *all of the facts* in the light most favorable to the trial court's orders, whether or not those facts were explicitly mentioned by the trial court. (See, e.g., *Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511, 551-552.) That the trial court did not issue protective orders for the Thompsons and Hagens does not necessarily mean that the trial court disbelieved any evidence. (Cf. *Reid v. Moskovitz* (1989) 208 Cal.App.3d 29, 32 [trial court explicitly declined to make a particular factual finding, therefore it would not be presumed on appeal].)

II

*Analysis*

The statutory basis for the orders does not require violence or even threats of violence.

Code of Civil Procedure section 527.6[3] provides in relevant part as follows:

"(a)(1) A person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an injunction prohibiting harassment as provided in this section.

[¶] . . . [¶]

"(b) For the purposes of this section:

"(1) 'Course of conduct' is a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, facsimile, or computer email. Constitutionally protected activity is not included within the meaning of 'course of conduct.'

[¶] . . . [¶]

"(3) 'Harassment' is unlawful violence, a credible threat of violence, or *a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner.*" (Emphasis added.)

"Section 527.6 was enacted 'to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution.' [Citations.] It does so by providing expedited injunctive relief to victims of harassment." (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1412.) However, as a form of injunctive relief, the statute is not designed to *punish* past bad acts, but to *prevent* future ones where there is a reasonable probability those or similar bad acts, will be repeated. (See *Huntingdon Life*

_____

[3] Undesignated statutory references are to the Code of Civil Procedure.

9

*Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc*. (2005) 129 Cal.App.4th 1228, 1265-1266; *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 332-333.)

A "course of conduct" requires more than one act, evidencing a *continuity* of purpose. (See *Leydon v. Alexander* (1989) 212 Cal.App.3d 1, 4 (*Leydon*).)

Here, there was evidence the Hosses drove recklessly, many times, on the easement (often drunk and armed). As we discussed *ante*, we consider this evidence in addition to the evidence of misconduct on the three dates specifically referenced by the witnesses or declarations.

Further, contrary to the Hosses' view, the fact that there was no direct evidence that Dan Hoss was present on July 10, 2011--the O'Neils concede he was not there in their briefing--is not dispositive as to his liability. There was evidence he *was* present on July 31, 2012, when the Hosses trespassed on the O'Neils' property, and evidence of his presence on the generic occasions of reckless and apparently intoxicated driving up and down the easement, serving no evident purpose but to annoy all of the Hosses' neighbors.

The Hosses argue that the specific incidents described by the O'Neil family--on July 10, 2011, and February 20, 2012--occurred too far apart to evidence a course of conduct under the statute. We disagree. First of all, this ignores the evidence of a third, specific incident on July 31, 2012, and also ignores the evidence of "numerous" other instances of harassing driving by the Hosses. Second, a harasser may wait for the right opportunity. As one court observed in a case involving workplace retaliation, rather than civil harassment: "Retaliation often follows quickly upon the act that offended the retaliator, but this is not always so. For a variety of reasons, some retaliators prefer to take their time: They may wait until the victim is especially vulnerable or until an especially hurtful action becomes possible. *Or they may wait until they think the lapse of time disguises their true motivation*." (*Coszalter v. City of Salem* (9th Cir. 2003) 320 F.3d 968, 978, emphasis added.)

10

Similarly, the Hosses contend the petitions were filed too long after the last incident described by the O'Neils, and argues this proves the O'Neils were not truly afraid of further harassment. Factually, this argument is incorrect, because it again ignores the July 31, 2012, incident which, although not *witnessed* by the O'Neil family members, was made known to them and reasonably added to their fear. These petitions were filed August 29 and 30, 2012, a month after that third specific event, and included numerous declarations and exhibits, prepared and signed in the interim. This was not dilatory. In any event, the argument about timeliness of suit goes to the weight of the evidence of fear, not its sufficiency.

We agree with the Hosses that any acts of theirs that involved threatening to file suit or take steps to press the lawsuit they had filed were not "harassment" under the statute, but were protected activities. (See *Leydon*, *supra*, 212 Cal.App.3d at p. 5; *Smith v. Silvey* (1983) 149 Cal.App.3d 400, 406-407.) But that does not mean that the *manner* in which they entered the O'Neil property was protected activity, as the Hosses assert. The evidence shows that on July 31, 2012, the Hosses were drunkenly driving up and down the easement, endangering other people. The fact that they were near a disputed area in the underlying case does not excuse their conduct. Nor, particularly given the fact that the conduct occurred in the evening, was the trial court required to view this as a protected litigation-related inspection of the wood pile, as the Hosses insist, but could rationally conclude it was an act motivated by the animus generated by the lawsuit, not an effort to gather evidence for the suit. While the suit itself cannot be harassment, it obviously provided a *motive* for harassment, and does not constitute an excuse for harassment.

Finally, the Hosses contend their conduct, viewed objectively, was not sufficiently serious to cause a reasonable person to be seriously alarmed or annoyed. In this case, the totality of the record supports the trial court's orders.

11

While the Hosses argue "Riley's claimed emotional distress from a car parked on the . . . property for 15 minutes or so is not reasonable," here, the vehicle was parked on the O'Neils' rural property, in the nighttime, for no legitimate purpose, while a 16-year-old girl was alone inside the house. Riley knew the Hosses had engaged in other harassing acts against her family, and other evidence shows they were often drunk and often armed. Any reasonable person in this situation would be alarmed. And this one occasion must be added to the totality of the Hosses' conduct over time. We agree with the Hosses that merely *parking* on a driveway easement may not be harassment. (See, e.g, *Byers v. Cathcart* (1997) 57 Cal.App.4th 805, 812.) But here, the Hosses repeatedly drove up and down the rural road drunkenly, at speeds topping 50 miles per hour, sometimes armed, and sometimes stopped to menace their neighbors.

Accordingly, the trial court properly found the O'Neils had proven their entitlement to civil harassment restraining orders against both Anna and Dan Hoss.[4]

_____

[4] We note the trial court purported to limit the firearm restriction to the UTV and also to allow the Hosses to possess firearms to hunt.

Section 527.6, subdivision (t) provides: "(1) A person subject to a protective order . . . shall not own, possess, purchase, receive, or attempt to purchase or receive a firearm or ammunition while the protective order is in effect. [¶] (2) The court shall order a person subject to a protective order . . . to relinquish any firearms he or she owns. . . . [¶] (3) Every person who owns, possesses . . . a firearm or ammunition while the protective order is in effect is punishable pursuant to Section 29825 of the Penal Code."

"It is a well-settled principle of statutory construction that the word 'may' is ordinarily construed as permissive, whereas 'shall' is ordinarily construed as mandatory, particularly when both terms are used in the same statute." (*Common Cause of California, et al. v. Board of Supervisors of Los Angeles County, et al.* (1989) 49 Cal.3d 432, 443.) Section 527.6, subdivision (r) provides that a prevailing party "may" be awarded costs and fees. Thus, "shall" in subdivision (t) seems to reflect a mandatory prohibition which was not ordered as required in this case.

Because we uphold the restraining orders, we reject the Hosses' claim that they are entitled to attorney fees and costs, because they are not the prevailing parties.

## DISPOSITION

The restraining orders are affirmed.  The Hosses shall pay costs on appeal to the O'Neils.  (See Cal. Rules of Court, rule 8.278.)


                                                                 _____DUARTE_____, J.


We concur:


____NICHOLSON____, Acting P. J.


____ROBIE____, J.